The BOEING COMPANY, Appellant,

v.

Daniel C. SHIPMAN, Appellee.

No. 24588.

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1968.

Harold F. Herring, Lanier, Price, Shaver & Lanier, Huntsville, Ala., for appellant.

Edgar E. Smith, Humphrey, Lutz & Smith, Huntsville, Ala., for appellee.

Before RIVES and GODBOLD, Circuit Judges, and HUGHES, District Judge.

RIVES, Circuit Judge.

This diversity, personal injury action requires us to stop and review to some extent the standards to be applied in ruling on motions for directed verdict and motions for new trial grounded on insufficiency of the evidence to support a verdict.

The employee Shipman claimed damages against his employer Boeing, under the common law and the Alabama Employers' Liability Act,[1] for alleged injuries received in the course of his work for Boeing. His work under this employment lasted for less than three months, i. e., from December 18, 1964 to March 8, 1965. He charged his employer with negligent or wanton failure to furnish him with a reasonably safe place to work in that he was required to spray paint in a room not adequately ventilated to exhaust the fumes and particles of paint, that he was furnished no mask to prevent inhalation, that he was required to handle harmful chemicals without the protection of gloves, and was not warned of the dangers of his employment in such circumstances. He averred that this negligent or wanton misconduct proximately resulted in his contracting lead poisoning, polyneuritis, dermatitis, and an aggravation of his pre-existing bronchitis. He alleged a gradual injury by reason of inhalations and absorptions of paint fumes and other chemicals which brought his action outside of the State's workmen's compensation act requiring an accident.[2]

Boeing pleaded in defense that it was not guilty of any misconduct which proximately caused injuries to Shipman, contributory negligence, assumption of risk, and that the Workmen's Compensation Act barred Shipman from maintaining an action for damages.

After a full trial,[3] Boeing's motion for directed verdict was denied, the jury returned a general verdict for Shipman, assessing his damages at $10,000.00, and judgment was entered on that verdict. Later the court denied Boeing's motion for judgment notwithstanding the verdict and, in the alternative, for a new trial.

On appeal, Boeing asks us to review each of the court's rulings. Thus, the broad question presented for decision is the sufficiency of the evidence to sustain the verdict.

The critical issues of fact were whether Boeing failed to furnish Shipman a reasonably safe place to work, and, if so, whether such failure proximately resulted in injury to Shipman. Shipman testified that he had had some, but not much, experience with spray painting before this employment; that he was employed as a "special projects mechanic"; but that Boeing required him to spray paint for nearly all of the three months of his employment. He was furnished a spray booth equipped with an adequate exhaust system. However, on occasions, he testified that he was directed by his superior not to have the exhaust fan on. His explanation, "because we were getting dust on the finished products," was excluded on Boeing's motion. Most of the pieces of material were too large for the booth and were painted in an area within the shop marked by a painted yellow line on the floor which was some 12 or 13 feet wide

---

1. Particularly under Tit. 26, § 326, Code of Ala., 1940.

2. Shipman based his case on Gentry v. Swann Chemical Co., Ala.1937, 174 So. 530; Foreman v. Dorsey Trailers, Inc., 256 Ala. 253, 1951, 54 So.2d 499; and Dorsey Trailers, Inc. v. Foreman, 260 Ala. 141, 1953, 69 So.2d 459.

3. The record comprises 522 printed pages plus numerous exhibits.

and some 14 or 15 feet long. The shop, in which other employees worked, contained machine tools and welding equipment and was some 85 feet long by 23 feet wide. Boeing introduced a mass of testimony to show that the shop was equipped with an adequate heating and air conditioning system and some six openings. However, Shipman testified that when he sprayed paint ontside the booth the fumes and particles of paint would not be carried away. "It would go over all the shop. I mean naturally it would fog more closer to the area to the gun because it will go to settling as it goes away, but the fan would not carry it away if you were out of the booth." In this Shipman received some corroboration from a fellow employee. Shipman testified that such gloves as were furnished to him had holes in the fingers or were plastic gloves, the seams of which would open up; that he asked his supervisor for a respirator mask and gloves, but they were never furnished. Boeing's testimony went to show that there was no need for Shipman to use a mask because the ventilation was adequate, but that masks were readily available to Shipman, and that three pairs of safety gloves were available to him.

There was a mass of additional evidence as to the safety of the place to work, which we find to be accurately summarized on pages 4 to 16 of the appellant's brief. The appellee does not dispute appellant's statement, but files a statement (appellee's brief, pp. 2–4) "supplemental in nature since appellant has set forth a rather lengthy statement in its brief."

On the issue of proximate cause of Shipman's injuries, two physicians were introduced by the plaintiff, neither of whom testified to more than a possibility that his ailments were causally connected with his working conditions. Shipman testified that before starting this work he had worked regularly and had no physical disabilities except a back injury, a slight cough and a chest pain; that by the last day he worked, his hands had become completely sore "up halfway to my elbows" and "actually bleeding on the parts. I would have to take paper and pick up parts because they were bleeding on the parts." On his last day of work, and for several preceding days, he got sick and vomited when he was in the paint shop area. He went home about 4 o'clock P.M. to rest a while and return later to complete a rush job. At home he again vomited, later fainted, and was taken to the hospital where Dr. Huber diagnosed his ailment as "Polyneuritis, etiology unknown." Dr. Huber testified that polyneuritis is "a condition affecting the various functions of a nerve supplying a group of muscles" and that its causes are numerous, including toxic substance. Dr. Huber further testified:

"* * * that the bronchitis he had for some years was aggravated by mainly two factors, chronic cigarette smoking, which he had done for a number of years, and that it was probably aggravated temporarily by substances he might inhale at work. This would include, not necessarily chemicals, but dust or any type of substance that he breathed, something that he breathed in that wasn't supposed to be there, from dust to most anything else."

Dr. Morton, whose specialty was psychiatry and neurology, testified that, "The diagnosis was psychoneurosis, anxiety state was made. This was based on the history, my neuropsychiatric examination, and, number two, exposure to toxic fumes was based on the history." Shipman's wife confirmed her husband's testimony as to the condition of his hands and his other physical symptoms, and testified as to a change in his personality.

"A. He has become more nervous with things that the children would do, and at times quite cross with them for their noise. And sometimes maybe he would feel bad, and they would disturb him while he was reading, or listening to the news, or something of that sort; and that is the biggest thing I know, he seems more nervous, and not as considerate of our feelings as he had been."

On the question of Boeing's alleged misconduct, the evidence is weak, especially in view of the short time that Shipman worked for Boeing. The evidence as to causal connection between the claimed unsafe conditions of Shipman's place of work and the ailments which he suffered can be held sufficient to sustain the jury's verdict only by the application of an extremely liberal standard.[4]

We come then to examine the standards to be applied on motion for directed verdict and on motion for judgment notwithstanding the verdict, and the standard to be applied on motion for new trial and on appellate review of the denial of such a motion.

Standard to be Applied on Motion for Directed Verdict and on Motion for Judgment Notwithstanding the Verdict.

■■■■ On the question of whether the court is to look only to the evidence favorable to the party against whom the motion for directed verdict (request for affirmative charge in Alabama) is made, or whether it is to consider all of the evidence, the Alabama courts are firm in their holding that all of the evidence must be considered, though viewed in its most favorable aspect to the party against whom the motion is directed.[5] On the other hand, in a Federal Employer's Liability Act case, the United States Supreme Court has held that: "It is the established rule that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given." Wilkerson v. McCarthy, 1949, 336 U.S. 53, 57, 69 S.Ct. 413, 415, 93 L.Ed. 497.

■■ In Alabama a scintilla of evidence of negligence requires submission of the issue to the jury.[6] In Reuter v. Eastern Air Lines, 5 Cir. 1955, 226 F.2d 443, 445, 446, we held that

"In diversity cases, therefore, even since Erie, the scintilla of evidence rule prevailing in Alabama and in some other states has no application in the federal courts.[6]

6. See Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857; White v. New York Life Ins. Co., 5 Cir., 145 F.2d 504, 509; 5 Moore's Federal Practice, 2d ed., Sec. 38.10; 2 Barron & Holtzoff Federal Practice, Sec. 1075, p. 759; cf. Pierce Consulting Engineering Co. v. City of Burlington, 2 Cir., 221 F.2d 607, 610.

"In determining whether there is sufficient evidence to take the case to the jury, a federal judge performs a judicial function and is not a mere automaton. Gunning v. Cooley, 281 U.S. 90, 93, 50 S.Ct. 231, 74 L.Ed. 720. He must determine, 'not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it.' Improvement Co. v. Munson, 14 Wall. 442, 448; see Railway Express Agency v. Mallory, 5 Cir., 168 F.2d 426, 427. 'The requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict.' Myers v. Reading Co., 331 U.S. 477, 485, 67 S.Ct. 1334, 1339, 91 L.Ed. 1615; see Thomas v. Atlantic Coast Line R. Co., 5 Cir., 223 F.2d 1, 4."

The continued validity of that holding is subject to serious doubt if the

4. Shipman's credibility was also attacked and the evidence showed that in 1961 and 1962 he was arrested eleven times for issuing worthless checks, and that there were three convictions for that offense and another conviction for concealing property subject to execution.

5. Louisville & Nashville R. Co. v. Cooke, 1958, 267 Ala. 424, 103 So.2d 791, 794, and cases there cited. Tobler v. Pioneer Mining & Mfg. Co., 1909, 166 Ala. 482, 52 So. 86, 97.

6. On the other hand, Alabama courts hold evidence insufficient to support a verdict when the necessary inferences are mere matters of conjecture or speculation. Brown v. Floyd, 1909, 163 Ala. 317, 50 So. 995, 996.

standards applied in FELA cases must also be applied in diversity cases.[7]

■ As far back as 1952, we held that even in diversity cases federal courts are forbidden by the Seventh Amendment to re-examine any fact tried by a jury otherwise than according to the rules of the common law.[8] If (and this is an important "if") the standards of review applied in FELA cases are the *only* standards that accord with the rules of the common law, then the conclusion is inescapable that those standards must be applied by federal courts in diversity cases. The arguments pro and con on the question of whether the FELA cases are controlling in all jury cases in federal courts are well summarized in 2B Barron & Holtzoff, Federal Practice & Procedure § 1075, pp. 401–404, as follows:[9]

"Plainly these cases [referring to FELA cases previously discussed] evidence a very restrictive view of the circumstances under which a directed verdict, or judgment notwithstanding the verdict, may be ordered in actions under these two statutes. [FELA and the Jones Act]. There are emphatic dissenting opinions, however, and many of these cases are decided by a vote of five to four. It is extremely important to know whether the decisions are confined to the particular statutory actions in which they have been handed down, or whether they represent a construction of the Seventh Amendment, and thus are controlling in all jury cases in federal courts. To this question there are powerful arguments both ways, and no very clear answer.

"The arguments for saying that these decisions are to be confined to FELA and Jones Act litigation are these: (1) there is emphasis in some of the opinions on the intent of Congress in passing this legislation to secure the right to a jury determination; (2) the Court says that 'this statutory negligence action' is 'significantly different from the ordinary common-law negligence action'; (3) dissenters refer to the opinions as setting out a rule confined to FELA and Jones Act cases; (4) some lower courts, and commentators, have considered that the decisions are so confined.

"The arguments to the contrary, that these decisions by the Supreme Court state a general rule applicable to all federal jury cases, are these: (1) the opinions announcing this rule refer to 'the jury's historic function' and to the Seventh Amendment, and the Court itself has cited these cases as representing the 'federal test of sufficiency of the evidence to support a jury verdict where federal jurisdiction is rested on diversity of citizenship'; (2) some commentators have so understood the cases as announcing a general rule; (3) in a little-noticed series of per curiam opinions, the Court has reversed judgments of lower courts which have substituted their views of the sufficiency of the evidence for that of the jury in non-FELA or Jones Act cases; (4) there is at least a fair argument that Congress could not constitutionally give a broader role to the jury in these statutory actions than that guaranteed by the Seventh Amendment.

"A decision by the Supreme Court, clearly stating which view it takes as to the scope of the FELA and Jones

---

7. See dissenting opinion of Justice Harlan in Ferguson v. Moore-McCormack Lines, 1957, 352 U.S. 521, 563–564, 77 S.Ct. 457, 1 L.Ed.2d 511; 5 Moore's Federal Practice, 2nd ed., ¶ 50.02 [1], pp. 2324, 2329, 2330.

8. Wright v. Paramount-Richards Theatres, 5 Cir. 1952, 198 F.2d 303, 306.

9. We omit the copious footnotes in the interest of brevity and because that question seems to be now settled in this Circuit.

Act decisions, would be of helpful guidance to the lower federal courts."

As indicated in the last preceding footnote, that question has now been settled in this Circuit by the holding in Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir. 1967, 380 F.2d 869, cert. denied, Nov. 6, 1967, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282, that federal courts must apply the same standards employed in FELA cases to diversity cases in determining sufficiency of evidence to raise a question of fact for the jury. Though that case was decided less than six months ago, it has been followed by this Circuit no less than five times.[10]

 As to causal connection between Boeing's alleged wrongful failure to furnish Shipman a safe place to work and Shipman's ailments, the Alabama courts would, in all probability, hold that that question is peculiarly within the domain of medical science, and that medical testimony is essential.[11] That is not true in the federal court in FELA and Jones Act cases when the ailment or aggravation becomes evident shortly after the defendant's wrongful conduct.[12]

 Under standards now applicable in this Circuit, we are constrained to hold that the district court properly denied Boeing's motion for directed verdict and its motion for judgment notwithstanding the verdict

Standard to be Applied on Motion for New Trial and on Appeal from a Denial of Such Motion.

 In the state of the law in this Circuit since Planters Manufacturing Co. v. Protection Mut. Ins. Co., supra, the exercise of the discretion remaining in the district court in ruling on a motion for new trial becomes all the more important. That discretion is extremely broad.[13] As said by Judge Sibley in the leading case of Marsh v. Illinois Central R. Co., 5 Cir. 1949, 175 F.2d 498, 499, 500:

" * * * the common law power of the trial judge to grant a new trial in his discretion, irrespective of error and merely because he does not think the verdict right, is fully preserved. Parsons v. Bedford, Breedlove & Robeson, 3 Pet. 433, 7 L.Ed. 732. * * * A motion for new trial is addressed to the trial judge's discretion. He may grant a new trial if he thinks he has committed error; and he may grant one (and he alone can) because he thinks the verdict is wrong, though supported by some evidence. The exercise of his discretion is not ordinarily reviewable on appeal, though a failure to exercise discretion, or an abuse of it, may be corrected. The motion for a new trial is entirely independent of the other two motions and is governed by different principles, and has a different result." [14]

10. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, decided Oct. 20, 1967; Liberty Mutual Insurance Co. v. Falgoust, 386 F.2d 248, decided Nov. 17, 1967; Equitable Life Assur. Society v. Fry, 386 F.2d 239, decided Nov. 28, 1967; Marshall v. Mintz, 386 F.2d 415, decided Dec. 1, 1967; Remington Arms Co. v. Wilkins, 387 F.2d 48, decided Dec. 13, 1967.

11. Alabama Pipe Co. v. Wofford, 1950, 253 Ala. 610, 46 So.2d 404, 406.

12. Sentilles v. Inter-Caribbean Shipping Corp., 1959, 361 U.S. 107, 109, 110, 80 S.Ct. 173, 4 L.Ed.2d 142, see quotation

from that decision in Jones v. Landry, ms., 5 Cir., 387 F.2d 101, decided Dec. 11, 1967.

13. However, successive grants of new trial solely because the verdict is against the weight of the evidence cannot be limitless without violating the constitutional right of jury trial. 3 Moore's Federal Practice, 2nd ed. ¶ 59.08 [5], pp. 3816, 3817.

14. See also Judge Parker's opinions for the Fourth Circuit in Aetna Casualty & Surety Co. v. Yeatts, 4 Cir. 1941, 122 F.2d 350, 353, and Virginia Railway v. Armentrout, 4 Cir. 1948, 166 F.2d 400, 408, 4 A.L.R.2d 1064.

As indicated by Judge Sibley and Judge Parker in the cases just cited, a trial judge's denial of a motion for new trial may be reviewed only for abuse of discretion.[15] In Whiteman v. Pitrie, 5 Cir. 1955, 220 F.2d 914, 919, we said:

"When should an Appellate Court reverse the district court for abuse of discretion in the denial of a motion for new trial, which was based on the ground that the verdict was against the weight of the evidence? The inherent nature of the question is such that it cannot be answered with certainty and exactness. About as definitely as the rule may be safely stated is that the discretion of both the appellate court and of the trial court should be exercised to nullify a seriously erroneous result and to prevent a miscarriage of justice. 6 Moore's Federal Practice, Para. 59.05(3), et seq., pp. 3743–3759." [16]

We have found only one case in this Circuit where we held that a district judge abused his discretion in denying a motion for new trial based on the ground that the verdict was against the weight of the evidence.[17]

Under all of the circumstances of this case, including the fact that the district court denied Boeing's alternative motion for new trial several months before this circuit's decision in Planters Manufacturing Co. v. Protection Mut. Ins. Co., supra, we hold that the district court was not guilty of an abuse of discretion in denying the motion for new trial.

The judgment is therefore

Affirmed.

---

15. See also 6A Moore's Federal Practice, 2nd ed., ¶ 59.08 [5], p. 3820, notes 34 and 35.

16. See also Pruett v. Marshall, 5 Cir. 1960, 283 F.2d 436, 438.

17. Georgia-Pacific Corporation v. United States, 5 Cir., 1959, 264 F.2d 161, 166.